1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES of AMERICA   )   14-30076
                           )
                           )
          Plaintiffs,      )
                           )
     Vs.                   )   East St. Louis, Illinois
                           )   December 11, 2014
WILLIAM J. MABIE,          )
                           )
          Defendants,      )

          EXCERPTED TRANSCRIPT OF TRIAL, VOLUME IV
           BEFORE THE HONORABLE MICHAEL J. REAGAN,
          UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff:        UNSELL & SCHATTNIK
                          By:  Daniel R. Schattnik
                          3 South 6th Street
                          Woodriver, IL  62095

For the Defendant:        ASSISTANT U.S. ATTORNEY
                          By:  Stephen B. Clark
                               Jonathan S. Drucker
                          Nine Executive Drive
                          Fairview Heights, IL   62208

Court Reporter:           Barbara Kniepmann
                          750 Missouri Avenue
                          East St. Louis, IL  62202

Proceedings recorded by mechanical stenography, transcript
produced by computer.

33

1              WILLIAM J. MABIE, DEFENDANT, SWORN

2                     DIRECT EXAMINATION

3     Questions by Mr. Schattnik:

4     Q.    Thank you, Your Honor.  State your name please.

5     A.    William James Mabie, M A B I E.

6     Q.    You are the defendant in this case?

7     A.    Yep.

8     Q.    Up until August of 2008, where did you reside?

9     A.    Festus, Missouri.

10    Q.    With whom?

11    A.    My sister.

12    Q.    Mary Mabie Burton, who was here in Court this week?

13    A.    That's correct.

14    Q.    Would you explain to the jury your chosen trade or

15    occupation?

16    A.    Auto body, some mechanical work, some other high

17    performance.

18    Q.    Do you use tools as part of your trade?

19    A.    Yes.

20    Q.    And what are the tools of your trade?

21    A.    Basically everything, wrenches, sockets kind of thing,

22    but for auto body like hydraulic equipment that specialized,

23    painting equipment, that type of thing.

24    Q.    Do guys who work in that area typically have their own

25    tools?

34

1    A.    Yes, sir, absolutely.

2    Q.    And what is the importance of having your tools to a

3    person in your line of work?

4    A.    Well, basically, if you don't have at least a general

5    set of tools, you are just not going to work at all.

6    Basically the better tools you have, the more money you make

7    is what it really comes down to.

8    Q.    In 2007, where were you working?

9    A.    Well, I was self-employed, but at 3430 Morganford.

10   Empire Auto was the name of my company.

11   Q.    Kind of explain self-employed but working somewhere.

12   How does that work?

13   A.    Right.  I was just renting a spot actually from Steve

14   Reisch.  It was Affordable Auto, but I was renting basically

15   an old service station with three bays, so I was renting the

16   three bays.

17   Q.    How does it work if you rent such space from somebody?

18   Who runs that kind of business?

19   A.    Just, you know, basically cash, pay him actually.  In

20   that case it was do some work on his cars, make it up with

21   cash so it was mutually beneficial.

22   Q.    During the course of your work at the building or

23   business owned by Steve Reisch, did you have occasion to

24   become aware of Michael Deeba?

25   A.    Yes.

1    Q.      In what capacity?

2    A.      He would stop by and call.  I mean I answered the phone

3    a few times, but he would stop by just for piddly stuff, maybe

4    some tires, recharge air conditioner, that type of thing.

5    Q.      So at times would he have work done on cars that he

6    owned at that location?

7    A.      Yes.

8    Q.      At times did you even work on some of those cars?

9    A.      Yes.

10   Q.      In 2007 it appears that your relationship with

11   Mr. Reisch came to an end.

12   A.      Seriously deteriorated, yes, sir.

13   Q.      And when that happened, what did you do to try to

14   maintain to continue working in your chosen trade?

15   A.      I went about trying to rent other buildings, actually

16   one next door.  I was blocked from that and then just a lot of

17   buildings out there where not necessarily -- you can't go

18   right in there and do body work, so.

19   Q.      During that time did you have occasion to leave your

20   work tools at property owned by Steve Reisch?

21   A.      Yes, I did, but I didn't -- the rent was paid.  It

22   wasn't like I was abandoning them.

23   Q.      So how did it work that you would have left your tools

24   there?

25   A.      Well like I say, I was trying to find other buildings,

1    so I just wasn't there.  I was trying to find other buildings,

2    but they were there, they were secure as far as I knew.

3    Q.     Just so that I have an idea and the jury has an idea,

4    we're talking about tools -- so we're talking about three

5    tools you hold in your hand, or a giant tool case or something

6    in between?

7    A.     Way more than that.  I brought them in there on a

8    flatbed and one ton van.  If you picture all together, say,

9    three pickup truck loads, something like that all together.

10   Q.     So it is a lot of tools, a lot of metal?

11   A.     Yes, and heavy weight, yeah.

12   Q.     And did anything happen to those tools to the best of

13   your knowledge?

14   A.     Yeah.  I was told after the fact that they had been

15   stolen.

16   Q.     Did you take steps to go through what I will call

17   regular channels to find out what happened to your tools?

18   A.     Yes, I did.

19   Q.     Briefly, let us know in general what steps you took and

20   what success you had.

21   A.     Well, I contacted the people there that lived at the

22   area and then from there the police department and then from

23   there the chief, Jennifer Joyce, the St. Louis prosecutor,

24   FBI, U.S. Attorney.  I mean this is dragging on over months,

25   but --

1   Q.      So in general with regard to the attempts that you made

2   to go through the channels, what success did you have in

3   finding out about your tools or getting them back?

4   A.      Absolute zero.  They just -- nobody acted like they

5   knew anything.  I know you think I should have been going

6   directly at Reisch, but I had also been informed of a standing

7   threat there.  It was just a bizarre situation really.

8   Q.      At some point in time did you become frustrated in your

9   efforts to get your tools back?

10   A.      I'm sure it already makes everyone's head hurt, but,

11   yes, extraordinary.

12   Q.      Did that frustration result in certain actions on your

13   part that resulted in your Indictment in the Eastern District

14   of Missouri with regard to communications with or about

15   Michael Deeba?

16   A.      About Michael Deeba.  Not actually with Michael Deeba,

17   but, yes, it did.

18   Q.      Basically you were charged in the Eastern District of

19   Missouri?

20   A.      Yes.  To clarify, I was actually charged at State Court

21   first, which ended up being dismissed, and then months later

22   in Federal Court.

23   Q.      All right.  Basically you had a trial in that case?

24   A.      Yes, sir.

25   Q.      I believe there has been testimony that trial took

1    place in the year 2010 in the month of August?

2    A.    August 16, 17, 18, yes, sir.

3    Q.    In terms of the witnesses and the evidence in that

4    trial with regard to your dealings about Michael Deeba in

5    2008, were they similar to the evidence and witnesses that

6    were discussed in this case with regard to those 2008 events?

7    A.    I would put it at 85 to 90 percent of what we heard

8    about the 2007, 2008 --

9    Q.    -- was a rerun of what happened in Federal Court in

10   2010?

11   A.    Absolutely.

12   Q.    You were convicted in that case?

13   A.    Yes, sir.

14   Q.    It is a felony?

15   A.    Yes, sir.

16   Q.    At some point in time in the process of your case in

17   the Eastern District of Missouri, did you come to believe that

18   Michael Deeba was getting divorced?

19   A.    Yes.

20   Q.    What gave you that idea?

21   A.    Well, at sentencing actually had a little side

22   conversation and then when he was on the stand that he made

23   the my wife and kids are utterly through with me, so between

24   the two things was -- I didn't really believe it.  I thought

25   he was just kind of padding things to try to jack up the

1  sentence basically.

2  Q.    Let's talk about why we're here.  Let's talk about the

3  letters in this case.  There is a letter that was written to

4  Sheriff Brown that forms the basis of Count 1.  You are aware

5  of that?

6  A.    Yes, sir.

7  Q.    That letter has been marked as evidence in this case as

8  Exhibit 16, I believe it is 16C, that the jury has heard about

9  and heard dramatic readings from, correct?

10  A.    Yes, sir.

11  Q.    Did you write that letter?

12  A.    Yes, sir.

13  Q.    Why?

14  A.    Well, Sheriff Brown had been a little bit past rude

15  with his 210 hours thing.  Same thing that was, I thought,

16  clearly done to try to jack up the sentence as basically a

17  favor to Mr. Deeba.  I knew that it couldn't possibly have

18  happened and so he was rude, so I thought I would voice my

19  opinion on that matter.

20  Q.    So in terms of what you described as efforts to

21  increase your sentence, and we had Sheriff Brown on the stand.

22  Basically he submitted information to the Court in that case

23  about a number of extra hours utilized by members of his

24  force, is that correct?

25  A.    Yes, in the letter I put it at 220 hours.  Actually

1  what he submitted was 210.  Small typo there.

2  Q.     You took exception to that?

3  A.     Yes.  When you are talking about putting somebody in

4  prison for several extra years, yes, that is kind of an issue.

5  Q.     Count 1 contains language of a portion of that letter

6  which the Government contends is an illegal threat.  In

7  writing that letter, did you intend to communicate a threat to

8  Sheriff Brown?

9  A.     No, I did not.

10  Q.     What did you intend with regard to your letter to

11  Sheriff Brown?

12  A.     Basically to, like I say, to express my extreme

13  displeasure with that, but also I knew he was tight with Deeba

14  and just some hope, like I say, anything to push the tool

15  thing along.  I mean I couldn't imagine what else I could do.

16  Q.     So what were you trying to convey to him by your choice

17  of words in that case?

18  A.     Well, really if you look closely, it is really about

19  the -- like I said, the bogus report, the non investigation,

20  just everything.  Makes my head hurt that it just can't be

21  like this.

22  Q.     In terms of -- it is a long letter and the Government

23  has pulled out a portion of that letter dealing basically

24  where it says as follows, "What happens when I'm released, oh,

25  no, and seek justice.  Please, please not that."  What do you

1    mean by that?

2    A.    Well, really the persons involved Klein, Anderson,

3    Deeba, Reisch, even Follmer and Brown really, if they truly

4    enforced the law all the way through, they would really have

5    serious issues there.

6    Q.    So you took exception with certain testimony and

7    statements from those people, is that fair to say, just in

8    general?

9    A.    Yeah.  I guarantee perjury, concealing evidence, the

10   whole greasy thing, yes, sir.

11   Q.    So when you indicate that you asked Callahan if he

12   would prosecute all you lying cock suckers or if you would

13   prefer kick your teeth in -- no response -- could it be you

14   maggots should look for a dentist -- group rates", portion

15   skipped over, and then it says, "Get moving cock wipe."  What

16   was your intent in using those words to sergeant or Sheriff

17   Brown in that letter?

18   A.    Well, that was actually kind of standard by then.  I

19   made that exact phrasing to Assistant U.S. Attorney Ware and

20   AUSA Callahan and it ended up that they did actually

21   prosecute.

22   Q.    Pardon?

23   A.    It ended up they did actually do some prosecution, pull

24   the thorn out of the paw a little bit there.

25   Q.    Is that with regard to Mr. Reisch?

1    A.     Yes, sir.

2    Q.     Count 2 has a letter written to Debbie Deeba in the

3    year 2012 that forms the basis of that count that has been

4    marked as Exhibit 17B.  Did you write that letter?

5    A.     Yes, I did.

6    Q.     Why did you write that letter?

7    A.     Similar thing, to find out -- basically press the

8    issues, was he basically committed perjury or was he trying to

9    put -- misconvey the thing to the Court to try to jack the

10   sentence up.  I had gotten no responses otherwise, so this a

11   little more direct.  I thought there would have to be some

12   type of response there.

13   Q.     There is language in that second letter that the

14   Government contends is an illegal threat.  Did you intend to

15   communicate a threat to Mrs. Deeba?

16   A.     No, I did not.

17   Q.     What did you intend with regard to that letter of 2012

18   to Miss Deeba?

19   A.     Well like I say, the same thing to really address all

20   of the issues going back to the tool thing, all the unlawful

21   things that I felt had been in that prosecution.

22   Q.     Now she wasn't involved in your prosecution, so why did

23   you write the letter to her?

24   A.     No, just to -- well, that was really the best way to go

25   prod Michael Deeba.  I knew Michael Deeba was -- I knew that

43

1    would draw his attention one way or another.

2    Q.    What were you trying to goad Michael Deeba to do?

3    A.    Same thing, to -- I mean he had to know by then this

4    whole Reisch tool thing couldn't possibly be right, that he

5    was in a position to make it right.

6    Q.    Did you think she was divorced?

7    A.    Well, I knew that was a little iffy because I had seen

8    divorce filing in the '90s.  I had heard the relationship was

9    a little rocky, so it could have been divorced or he could

10   have just been, like I say, padding things.  There would be

11   one way to find out.

12   Q.    Now the words used in Count 2, once again, reference

13   Callahan.  Who was Callahan?

14   A.    That is the United States Attorney, the top man for the

15   Eastern District of Missouri.

16   Q.    So he was the U.S. Attorney?

17   A.    Yeah.  I wouldn't know when he would have left office.

18   Q.    Had you actually attempted to speak with Mr. Callahan

19   at some point in time?

20   A.    It would have actually been before then.  I was

21   actually in the U.S. Attorney's office actually twice.

22   Between e-mailing and everything else, I actually made contact

23   with Christian Stephens, who had been assigned to the issue.

24   They were kind of moving on it, but frustrated, not swiftly

25   enough for me, so.

44

1    Q.      So you never talked to Callahan?

2    A.      No, but I had been writing him.

3    Q.      Now the words that were contained within this second

4    letter, the Count 2 letter to Miss Deeba, contains similar

5    references to Callahan and the option of prosecution versus

6    getting people's teeth kicked down their throat.  What were

7    you trying to convey to Miss Deeba by your choice of those

8    words?

9    A.      Well, really like I say, not so much to Miss Deeba that

10   I figured it would filter back to Mr. Deeba, but like I say,

11   Debbie Deeba is -- I mean kind of a non factor in the issue

12   really.

13   Q.      So in that communication, was your intent to

14   communicate a threat?

15   A.      No.

16   Q.      The third letter that makes up the Indictment in your

17   case is a letter also to Miss Deeba from March of 2013.  Are

18   you familiar with that letter?

19   A.      Yes, sir.

20   Q.      That is Exhibit 18B.  Did you write that letter?

21   A.      Yes, sir.

22   Q.      There is also language in that letter as articulated in

23   Count 3 that the Government contends is an illegal threat.

24   Did you intend to communicate a threat by including that

25   language in that letter to Mrs. Deeba?

1    A.     No, sir.

2    Q.     What did you intend with regard to that letter to Miss

3    Deeba?

4    A.     Well, there again, the tool thing was still an issue at

5    that point and that was pretty clear that I still want it

6    back, especially my father's property.  That is just beyond

7    terrible I think.

8    Q.     In terms of the tools that you have, are some of those

9    tools, tools that you received or inherited from your father?

10   A.     Yes, specifically -- like I specifically mentioned,

11   chain come along, very nice piece of equipment, hard to find.

12   It wouldn't matter.  It was from my father.

13   Q.     Now the language that is at issue in Count 3 is

14   different than the language in Counts 1 or 2.  There is no

15   Callahan, there is no teeth.  It basically indicates if you

16   think the old boy fought hard, wait till you see the length

17   that I'll go to to get his property back.  That is the essence

18   of that language.  What was your intent to convey with the use

19   of those words?  What message were you trying to send?

20   A.     I would guess just that to any possible listener, which

21   ended up being Deeba and Reisch, yeah, I still want my

22   property back no matter what.  I would like my property back

23   or my father's property really.

24   Q.     By using the words, "Wait till you see the length I'll

25   go to to get his property back," did you intend to communicate

1  a threat?

2  A.     No, but also wasn't willing to forget about it either.

3  Still not willing to forget about it.

4          MR. SCHATTNIK:  No further questions, Your Honor.

5          THE COURT:  Mr. Clark?  You know what, I made a

6  mistake.  I was supposed to ask you if you wanted to make an

7  opening statement.

8          MR. SCHATNIK:  At this point, Your Honor -- first

9  off, normally in a criminal case when I am a participant early

10  on, I do give a short opening to the jury to let them know

11  what to expect.  I assume the jury knows at this point in time

12  what to expect, so they don't need to hear it from me.

13          THE COURT:  Okay, thank you.  Mr. Clark, cross

14  examination?

15          MR. CLARK:  Thank you, Your Honor.

16                        CROSS EXAMINATION

17  Questions by Mr. Clark:

18  Q.     So you are still not willing to forget about this

19  business with the stolen tools?

20  A.     I can't see any reason why I should.  That is not

21  something you give away.  Now if there had been a good faith

22  effort to recover them and it just wasn't, but there hasn't

23  been.

24  Q.     But nevertheless, you're still not willing to forget

25  about the tools that you believe were stolen back in 2007 or

47

1    2008?

2    A.    I am quite sure they were stolen, and like I say, I

3    can't imagine why somebody would give that away and suffer all

4    the harm that I have suffered associated with it.

5    Q.    By the way, you mentioned chain come along.  I suspect

6    some jurors may not know what it is.  Could you explain?

7    A.    Right.  Well, this particular one was very heavy duty

8    thing.  This would be -- you might want to call it chain or

9    hoist or something that would hang from a ceiling and it is

10   very heavy duty, rated at three tons, which really means it

11   could pick up like 9,000 pounds.

12   Q.    What is it used for?

13   A.    You would use it for, say, pulling a large like diesel

14   engine or in the auto body aspect it makes it very nice,

15   something to pull the frame over with.  It is just a nice

16   piece of equipment to have around.

17   Q.    Thank you.  Getting back to the early part of your

18   testimony, you talked about having a trade of working in auto

19   body and doing mechanical work, right?

20   A.    Yes, sir.

21   Q.    And you also had some experience as a skip tracer, is

22   that correct?

23   A.    Well, yes, I took a few years in between there that I

24   repossessed cars, so with repossessing cars you have to find

25   them first, so skip tracing.

48

1   Q.     Could you explain to the jury what skip tracing is?

2   A.     Well, skip tracing is you are basically trying to

3   locate a person and or address.

4   Q.     Was that in relation to some towing business or towing

5   work that you were involved in?

6   A.     Well, that's what people have the wrong idea about

7   that.  Repossessing cars is really, at least it was for me,

8   very rarely you actually tow them.  Most of the time towing

9   your own vehicle back after you find the other one.  Empire

10  Auto was technically repossession auto company for a few

11  years.

12  Q.     That was your company?

13  A.     Yes, sir.

14  Q.     So you did do some work in repossessing cars?

15  A.     From 1997 to 2003 and in late on 2003 I lost an eye,

16  nothing to do with repossession.  I was actually at a

17  barbecue.  So that you really can't operate a tow truck

18  correctly with one eye, so that kind of did that.

19  Q.     So was the skip tracing aspect of your expertise, was

20  that for the tow business?

21  A.     Well like I say, you are trying to locate the person

22  and or the car.

23  Q.     So you skip trace meaning that what, you check out

24  records, you check out computer documents, check out county

25  records, court records, that sort of thing?

49

1  A.     Yeah.  The thing is, repossessing cars you are not

2  talking about a huge amount of money, just a few hundred

3  dollars, so you couldn't spend a huge amount of time.

4  Typically you would look at case.net, which is -- I don't know

5  if, you know, Missouri has a site where it is like every court

6  case, so even if you get a traffic ticket you get on there.

7  Put in the person's name, it actually gives an address.  It is

8  not bad.  And the ATT toll free, so you can do the numbers in

9  reverse.  Really those were my two main things.  You could

10 spend an hour or two looking for each car, but you couldn't

11 spend days.

12 Q.     The purpose of it was to locate the whereabouts of

13 either people or property, correct?

14 A.     Yes, sir.

15 Q.     And Mr. Schattnik asked you about the importance of

16 your tools.  You said if you don't have them you don't work,

17 right?

18 A.     Yes.

19 Q.     And at some point, I believe, in this, in the last

20 several years, you, in talking about the importance of these

21 tools, you said they mean everything to me, didn't you?

22 A.     Well as far as making a living, unless I was to switch

23 living, yeah, it was a serious crimp in style.  I could,

24 obviously, do other things to survive, but that is not

25 necessarily my chosen.

50

1    Q.      Right.  So they did mean everything to you at least as

2    far as your work was concerned?

3    A.      As far as that line of work, but yeah, they are very

4    important.  If they would have been stolen and investigated

5    properly and that, that is bad, but like I say, the

6    circumstances of how it was just so bizarre, that I still

7    can't get anybody to even talk to me for five minutes, it is

8    beyond me.  I don't know.

9    Q.      Okay.  So as a matter of fact, you did talk to Deeba

10   for several minutes?

11   A.      And Klein, and not once was this case, or Wenstrom, or

12   a report number ever mentioned.

13   Q.      Right.  Nothing was resolved as far as you were

14   concerned with respect to the stolen tools, right?

15   A.      No, they, I would say, deliberate attempt to conceal.

16   Q.      I realize that is your position, but in reality nothing

17   has been found or determined as to whether or not they have

18   been stolen or simply left behind or misplaced?

19   A.      No, it is very certain they have been stolen.

20   Q.      In your mind.

21   A.      I think the Eastern District of Missouri cleared that

22   up quite well, but yeah, there is no question about that.

23   There is no question there has never been an investigation.

24   Q.      When you say there has never been an investigation, you

25   say you talked to the police department over there, correct?

1    A.      Several times.

2    Q.      You have talked to the, in fact, the Chief of Police

3    over there or somebody in his department?

4    A.      At least somebody in his office.  Like I say, several

5    e-mails, a little e-mail back and forth.  Because I couldn't

6    tell them like a report number, they didn't have anywhere to

7    go either.

8    Q.      You couldn't get to the chief, so you dealt with

9    somebody else in his office?

10   A.      I think it was Joe Mackle (phonetic) I talked to the

11   one time, but he was like give me a report number.  That is

12   where I knew something is greasy in that Klein had the report

13   number for months and never said here is the report number, go

14   talk to Wenstrom.  Not once.

15   Q.      With respect to that same line of questioning, you

16   indicated that you went to Jennifer Joyce with the same

17   information and she was the city prosecutor at the time,

18   correct?

19   A.      Yes, actually in her office.

20   Q.      All right.  So you gave her all of that information?

21   A.      Yes, and they were baffled that they kicked me down the

22   street to the FBI.

23   Q.      So you talked to the FBI?

24   A.      Same thing in their building with a witness.

25   Q.      You talked to the U.S. Attorney or tried to talk to the

1    U.S. Attorney?

2    A.      No, the FBI eventually sent me to the U.S. Attorney

3    actually in their office.

4    Q.      Did you talk to the U.S. Attorney or one of the

5    assistants?

6    A.      No, Christian Stephens was on that and it was so

7    muddled and everything that I understand why it is a problem

8    and now I really see why it was a problem.

9    Q.      So all of these people you talked to, nobody

10   investigated your claim of the tools being stolen, correct?

11   A.      No.

12   Q.      And did you ever pursue a civil lawsuit to get your

13   tools back or get a money judgment for that?

14   A.      Actually, I did look up Mr. Reisch on the internet as

15   far as that and -- stupefied.  I had no idea who I was dealing

16   with.

17   Q.      All right.  What I am asking is did you ever sue him

18   basically?

19   A.      I determined it would be beyond futile.

20   Q.      The question is, did you sue him?

21   A.      No.

22   Q.      You never sued Michael Deeba?

23   A.      No.

24   Q.      Never sued any of the other police officers who might

25   have been involved in the investigation?

1    A.    Actually, John Anderson I did sue.

2    Q.    You did sue.  And what was the suit over?

3    A.    Civil rights violations.

4    Q.    All right.  So it didn't have anything to do with your

5    tools?

6    A.    Well, actually, the non investigation and the

7    concealing evidence of such, yes.

8    Q.    What was the result of that suit?

9    A.    Actually, I would be pending certiorari to the U.S.

10   Supreme Court right now.

11   Q.    Certiorari?

12   A.    Yeah.

13   Q.    What that is referring to is an appeal to the Supreme

14   Court?

15   A.    Yes.

16   Q.    So you have lost the suit before, it is on appeal to

17   the Supreme Court now?

18   A.    I am getting ready to file it.  The Eastern District of

19   Missouri had the appeal.  They said, well, no, but that was

20   combined.

21   Q.    So that is really what I am trying to get at here.  You

22   have been rejected by Courts and there would be no reason for

23   you to go to the Supreme Court if your suit hadn't been

24   rejected by other Courts, correct?

25   A.    So far.

54

1  Q.     You indicated before on your direct examination that

2  you had written the letters to Debbie Deeba, but you didn't

3  really intend to convey a threat to her, is that correct?

4  A.     No reason to whatever.

5  Q.     Because you had never met her, right?

6  A.     I believe I would have bounced into her once.  Not like

7  we hung out or anything, no.

8  Q.     Right.  So you may have bumped into her once, but she

9  indicated that she didn't remember you at all, right?

10  A.     No.

11  Q.     You don't have any reason to think that she would not

12  have been telling the truth when she said she didn't know you,

13  did she?

14  A.     No.  We ran into each other on the street and not

15  realized it.

16  Q.     So your intent then was to convey a message to Michael

17  Deeba instead?

18  A.     Well like I say, to kind of go in the side door there,

19  but, yes, I would have thought at some point he would have

20  been seeing it.

21  Q.     Your intention in writing the letter to Jeff Brown was

22  to convey what to Mr. Brown?

23  A.     That would be a serious Governmental grievance there of

24  what I would call a stunt that he tried to pull.

25  Q.     Let's talk about your allegations that it was a stunt

1    that he tried to pull.  He talked about his hours being used

2    in a proceeding over there in the Eastern District of

3    Missouri, correct?

4    A.     Well --

5    Q.     That is what he discussed on the stand?

6           MR. SCHATTNIK:  I would object.

7           THE COURT:  Hold on, hold on.  Objection?

8           MR. SCHATNIK:  I believe that it accidentally

9    mistakes evidence because Sheriff Brown indicated that he did

10   go to Court, he was going to testify, but instead of

11   testifying his information came through by proffer.

12          MR. CLARK:  Okay.

13   Questions By Mr. Clark:

14   Q.     So what he was testifying about were hours that he

15   claimed?

16   A.     Right.

17   Q.     I am talking about testifying here in this Court were

18   hours that he claimed had been spent by his department?

19   A.     Right.

20   Q.     That were submitted in one form or another to the U.S.

21   Attorney's office over there in the Eastern District of

22   Missouri and which were presented in Federal Court at your

23   sentencing, correct?

24   A.     That's correct.

25   Q.     Isn't it true that in reality the Judge over there

56

1    determined that those hours should not affect your sentence?

2    A.      True, but it is the attempt.  I mean it is just greasy

3    to try that.  That is not -- I mean that is so far past rude

4    it is not even funny.

5    Q.      So you were sentenced in 2010?

6    A.      Correct.

7    Q.      And you wrote your letter in 2012?

8    A.      January.

9    Q.      And you are saying that merely because he had been rude

10   that you wrote this letter to him?

11   A.      Well, rude slash really could be considered illegal,

12   but like I say, he is Deeba's buddy.  No way that could have

13   happened as it was portrayed there, so I considered it

14   infinitely inappropriate.

15   Q.      Even if he did misrepresent the hours that were worked,

16   the reality is that the Judge did not even use that

17   information to increase your sentence, did he?  In fact, he

18   rejected the prosecutor's argument that that should increase

19   your sentence, is that correct?

20   A.      Right, and that was conveyed I thought as that,

21   attempted to increase his sentence.

22   Q.      All right.  Let me show you what is marked as

23   Government Exhibit 30.

24   A.      Right.  I see here it says four level enhancement.  I

25   had that wrong in the letter too.  I think I said five or six.

57

1   Q.     To shorten up this matter, I am going to withdraw

2   the --

3   A.     Well in any case, what he stated is what you stated is

4   correct.

5   Q.     So the prosecutor attempted to use the information

6   provided by Sheriff Brown and the Judge said to the prosecutor

7   I am not going to use that to increase Mr. Mabie's sentence?

8   A.     Correct.

9   Q.     That was the end of it, right?

10  A.     Somewhat.

11  Q.     As far as --

12  A.     As far as the Court was concerned.

13  Q.     On the hour issue?

14  A.     Yes.

15  Q.     Correct.  So in effect, your sentence was not increased

16  as a result of anything that Sheriff Brown said?

17  A.     No.

18  Q.     Let me show you what is marked as Government

19  Exhibit 21.  I ask if you can identify this, please?

20          THE COURT:  Can you use cheaters?

21  A.     Like 150 or 2.

22          THE COURT:  175 would be even better.  Just wait a

23  second.

24  A.     Okay.  Yes, I do.

25  Q.     Could you tell the jury what that is, please?

58

1   A.     This was as far as I'm going to say for a subpoena of

2   John Ware.

3   Q.     So let me shorten it up.  It was a document that you

4   filed pro se in this Court, correct?

5   A.     Yes.

6   Q.     It was in this case, correct?

7   A.     Yes.

8   Q.     All right.  It is in your handwriting, correct?

9   A.     Yes.

10  Q.     In this document you indicate that Ware is the focus of

11  Counts 1 and 2 of this Indictment, correct, in this case?

12  A.     Yes.

13         MR. CLARK:  Your Honor, I would move for admission of

14  Government Exhibit 21 at this time.

15         MR. SCHATNIK:  I would object and ask that I be able

16  to make my objection at the side bar.

17         THE COURT:  Okay, I'll reserve ruling.

18         MR. CLARK:  Your Honor, I was going to display the

19  document if I could, if it can be admitted.

20         THE COURT:  Then we're going to go to side bar.

21         (Whereupon the following proceedings were held at

22  side bar, out of the hearing of the jury.)

23         THE COURT:  Let me see the document first because I

24  have not seen this before.  Okay, it is Document 117 in our

25  electronic filing system here filed October 21st of 2014.

1    Mr. Clark has a certified copy of the document.  Okay, your

2    objection?

3         MR. SCHATTNIK:  Twofold.  One objection is to the use

4    of a Court filing that was filed with the intent of making

5    legal arguments as if it is of a confession or statement.  I

6    believe it is inappropriate and it has a chilling effect on

7    litigants to be able to file pleadings.  The pleadings should

8    be construed in the same way as if I filed it on behalf of

9    Mr. Mabie.  It is for the purpose of seeking certain things

10   and, therefore, I believe it would be inappropriate to cross

11   examine him with regard to pleadings he filed in the case and

12   to display the pleadings to the jury in this fashion.

13        Second, the bulk of this pleading I would object, it

14   is irrelevant as to Rule 401 in that this pleading deals with

15   Mr. Ware, essentially, and not with Sheriff Brown and not with

16   Miss Deeba.  I assume that counsel is looking at the language

17   at the bottom of page two that deals with the Callahan

18   reference and the kicking in the teeth, but this is a legal

19   document filed for legal intent in what he was trying to do

20   and I believe it would be improper to cross examine him and to

21   then present this to the jury for that.

22        Additionally, if the Court did find there was some

23   relevance, I believe it would be more prejudicial than

24   probative, but this is a document that deals with Ware, it

25   deals with an attempt to receive legal redress through the

60

1    Court system and I believe it would be inappropriate, A, to go

2    into detail with him regarding this in front of the jury and,

3    B, it would be inappropriate to publish it to the jury.

4           THE COURT:  Mr. Clark?

5           MR. CLARK:  This specific matter that I wanted to

6    bring out was as Mr. Schattnik suggested on page two, it

7    states Ware was the focus, the essence of the sentences in

8    question.  Over in the margin it references Count 1 and 2 and

9    the quotation is I asked Callahan if he was going to prosecute

10   Ware or if he preferred kick his teeth in.  That is a factual

11   statement, Your Honor, and it seems to me that it is an

12   admission by the defendant that Ware was the focus of the

13   letter or letters in Counts 1 and 2 and the law is that -- the

14   law, the Statute, prohibits a conveyance of a threat to any

15   person, so regardless of what person he intended to direct it

16   to, it doesn't make any difference whether it was Brown or

17   Deeba or Ware, but he is admitting here that it was, that the

18   focus of that specific phrase was Ware.

19          THE COURT:  Aren't you retrying the Eastern District

20   of Missouri case, which you clearly argued we ought not do in

21   this case?

22          MR. CLARK:  No, not at all.  I am saying Mr. Mabie is

23   saying in this pleading, he is trying to explain our Counts 1

24   and 2, he is trying to suggest, I think, that it wasn't either

25   Deborah Deeba or Michael Deeba or Sheriff Brown that was the

61

1    focus of his threat, but it was John Ware was the focus of his

2    threat.

3            MR. SCHATTNIK:  He is not saying it is a threat.  He

4    is saying this is an admission that he was threatening

5    somebody.  This is not an admission of a threat, merely a

6    statement with regard to Ware and his efforts in the defense

7    of this case.

8            MR. CLARK:  Well, the interpretation of the word

9    threat --

10           THE COURT:  Under 403 I think this is going to

11   confuse the jury.  It confused me, so I am going to sustain

12   the objection.

13           (Whereupon the side bar proceedings were concluded.

14   The following proceedings were held in open Court.)

15   Questions By Mr. Clark:

16   Q.    Was John Ware the focus, at least partial focus, of the

17   letters?

18           MR. SCHATTNIK:  Objection, Your Honor.  Same

19   objection I just made.

20           THE COURT:  Sustained.

21   Questions By Mr. Clark:

22   Q.    With respect to earlier testimony you had regarding

23   Christian Stephens, you indicated that they, and I assume you

24   mean the people in the U.S. Attorney's office, they were not

25   moving quickly enough.  Am I correct in my assumption?

1   A.    Well, that's part of it, but that is not prosecuting or

2   wanting them prosecuted.

3   Q.    So let's clarify.  Who were you talking about when you

4   said they weren't moving quickly enough?

5   A.    Well, as far as moving quickly enough, yeah, they

6   didn't grasp the situation.  I would say I guess it was my

7   fault for not being able to portray it or document it well

8   enough.  Like I say, this case was assigned to Christian

9   Stephens.  I don't know, it was slow developing.  I realize

10   that is the way they do things, understandably.

11   Q.    All right.  So then with respect to Mrs. Deeba, you

12   indicated on your direct testimony that the letters to her

13   were not so much to her but that it would filter back to Mike

14   Deeba, correct?

15   A.    Well, it would certainly clarify the divorce issue and

16   at some point the actual truth should be documented there

17   somewhere or another.

18   Q.    What does three way sexual encounter have to do with

19   that?

20   A.    Not much.

21   Q.    So you suggested three way sexual encounter and it has

22   nothing to do with anything other than what?

23         MR. SCHATTNIK:  Objection, Your Honor, as to

24   relevance as to the charges.  These letters are long.  They

25   contain many factors that are not at issue that are clearly

63

1    not threatening and not charged as threats, but they may still

2    be rude letters.   It is inappropriate to get into other things

3    that are not at issue in this case in these letters.

4            THE COURT:   Overruled.   It has come out multiple

5    times during the course the case.   It is appropriate cross

6    examination.   You may answer.

7    A.    I'm not exactly sure of the question, but just in

8    general there, yeah, it is supposed to be rude.

9    Questions By Mr. Clark:

10   Q.    Supposed to be rude to Mrs. Deeba?

11   A.    And in context when we start talking about me being

12   rude compared to all the crimes on that side of the fence

13   committed, it is really shooting a little low.

14   Q.    You are talking about -- you're saying that it is okay

15   to suggest to Mrs. Deeba something about a sexual encounter

16   because you have a belief that crimes have been committed?

17   A.    I have an absolute, undeniable documentation they have

18   been committed again and again.

19   Q.    So it is okay for you to write these letters to

20   Mrs. Deeba?

21   A.    I think I would say it is actually a little on the low

22   side when you consider the actions of persons on your side of

23   the fence.

24   Q.    A little on the low side?

25   A.    Absolutely.

64

1   Q.      And the business about kicking people's teeth in, why

2   would it be necessary to tell Mrs. Deeba this if your

3   intention was really to get the message to Mike Deeba?

4   A.      Well, because that was the quote, that's the actual

5   sentence that I sent to Mr. Callahan, so to say anything else

6   would have not been accurate.  That is what I sent to Callahan

7   and Ware three or four weeks before, that exact sentence.

8   Q.      Again, your intention in sending this letter, these two

9   letters to Mrs. Deeba, was to get the message to Mike Deeba,

10  correct?

11  A.      Well, I think the ultimate goal was, like I say, to

12  produce some kind of action to correct all of these crimes on

13  that side of the fence.

14  Q.      Again, you never bothered to sue any of these people

15  other than Anderson as you indicated, correct?

16  A.      And Ware, Sauer, FBI Agent Cronan, few -- actually

17  there was actually ten persons all together.  All but two.

18  Q.      That was in relation to a civil rights claim you said

19  you had?

20  A.      Which is the action that we're talking about.

21  Q.      Civil rights action, but not for the theft of tools?

22  A.      The non investigation and the corrupt Government

23  conduct associated with the non investigation.

24  Q.      What about Steve Reisch?  Was he in there?

25  A.      No.

1   Q.     No?  He was the one who allegedly stole the tools

2   though, correct?

3   A.     Absolutely stole the tools.

4   Q.     So the investigation -- I am sorry, the complaint you

5   say had to do with lack of investigation?

6   A.     Total.  Not just lack of investigation, but the

7   covering up and, you know, that they really blocked me from

8   even having any idea what was going on.

9   Q.     No Court has determined that your position is correct,

10  is that right?

11  A.     I don't know about that, but actually the Eastern

12  District of Missouri a couple of weeks ago let me know that

13  there had been perjury involved, that is U.S. Attorney for the

14  Eastern District of Missouri.

15  Q.     Do you have any evidence of that?

16  A.     Actually, I do.

17  Q.     Where is it?

18  A.     It would be over there behind the table.  It would be

19  document in case number 14-3449, page five and six of the U.S.

20  Attorney's filing of November 20th of 2014.

21  Q.     What is the nature --

22  A.     By AUSA Berlotti (phonetic).  He is confirming that

23  Reisch pled guilty to conspiracy to distribute on a case that

24  also involved money laundering that spanned several years, so

25  in other words the allegations that I made to Klein was

66

1    absolutely accurate.

2    Q.    And do you have that document available for review?

3    A.    If you want to take a recess.

4         THE COURT:  Why don't we take a few minutes.  Folks,

5    do you want to take a few minutes break and we'll get

6    documents together?

7         (Whereupon the following proceedings were held out of

8    the hearing of the jury.)

9         MR. SCHATTNIK: I'll object in that this line of

10   questioning is requesting the defendant to produce documents

11   in evidence against himself in violation of his Fifth

12   Amendment rights.

13        THE COURT:  Well, I think he wants to produce.

14   Sounds to me like it might help him.  If you want to look at

15   it?

16        MR. SCHATTNIK:  Well, maybe look at it.

17        THE COURT:  Look at it first and decide where you

18   want to go.

19        (Whereupon a recess was taken.  The following

20   proceedings were held in open Court.)

21        THE COURT:  Mr. Clark, please continue.

22        MR. CLARK:  Thank you, Your Honor.

23   Questions By Mr. Clark:

24   Q.    Mr. Mabie, I think we may have been confused.  Perhaps

25   it was the manner in which I asked the question.  The document

67

1    you were referring to had something to do with an appeal

2    regarding your conviction, correct?

3    A.      Yes.

4    Q.      Okay.  What I was intending to ask you was about the

5    tools themselves.  You indicated that you had filed something

6    somewhere regarding your tools and I am talking specifically

7    about a civil action against either Reisch or Deeba or anyone

8    else looking for the value of your tools.  Did you ever sue

9    anybody over the value of your tools?

10   A.      I would say -- that's what I would say the civil rights

11   action is.

12   Q.      So it was a civil rights action again, not the document

13   you were referring to earlier, correct?  I am sorry, not the

14   document that we had looked at over the break, correct?

15   A.      No, that addresses Reisch's other activity.

16   Q.      This was an appeal, but you did indicate that you had

17   filed some kind of civil rights action as well?

18   A.      Right.

19   Q.      On the other hand, has any Court entered an order in

20   your favor with respect to -- a final order with respect to

21   your complaint about the civil rights action?

22   A.      I don't consider it final.  I mean I am still pursuing

23   it if that's what you mean.

24   Q.      Let me ask you a different way.  Has any Court ever

25   awarded you a money damage or money judgment for the civil

68

1    suit that you filed?

2    A.      No.

3    Q.      Okay.

4    A.      But I would say it is ongoing.

5          MR. CLARK:  That's all of the questions I have, Your

6    Honor.

7          THE COURT:  Mr. Schattnik?

8          MR. SCHATTNIK:  Thank you, Your Honor.

9                        REDIRECT EXAMINATION

10   Questions by Mr. Schattnik:

11   Q.      Let me clarify just a few points.  You were asked about

12   the fact that you had never sued Steven Reisch.  Why have you

13   not sued Steven Reisch?

14   A.      A true waste of ink.  In the discovery from the

15   Missouri case they showed his civil suits and it was like 30

16   or 32 civil suits.  He had only ever actually paid one, so he

17   had 20 something judgements and nobody ever got a dime.  I

18   didn't see where -- I would be number 25 in that line.

19   Q.      In terms of the discussion between you and Mr. Clark

20   with regard to the production of these two pages, just in

21   general, these are two pages that are from a filing by the

22   U.S. Government from a 2255, correct?

23   A.      Correct.

24   Q.      Basically in that the Government disclosed in

25   November 2014, more than four years after the trial in this

69

1   case, the Government became aware that Reisch had pled guilty?

2          MR. CLARK:  I am going to object to the hearsay

3   nature of this, Your Honor.

4          MR. SCHATTNIK:  Let me put it this way then.  Your

5   Honor, I don't have the case number because I am not able to

6   get on the internet, but I have looked up -- and I think my

7   client is waving his hands.  But I would ask the Court to take

8   judicial notice of the case United States of America versus

9   Steven Reisch in the Eastern District of Missouri.  And

10  Mr. Mabie, do you know the case number?

11         THE COURT:  We have it.  We're ahead of you.

12         MR. CLARK:  May I offer Mr. Schattnik the opportunity

13  to introduce the conviction of Mr. Reisch?

14         MR. SCHATTNIK:  Well, I think we're all in agreement

15  that it exists, thanks.

16  Questions By Mr. Schattnik:

17  Q.     So that is what you were referencing, correct?

18  A.     Yes, and actually if I could --

19  Q.     Let me, just briefly, let me say that some of the

20  complaints in your letters dealt with the fact that you

21  complained that Reisch was a drug dealer that was not being

22  gone after by the police, and in terms of that conviction it

23  seems to bear out part of these allegations, correct?

24  A.     Yes, that it was an ongoing, yes.

25         MR. SCHATTNIK:  Thank you.  No further questions.

70

1    THE COURT:  I'll give you a couple of minutes to

2 confer.

3 Questions By Mr. Schattnik:

4 Q.  Basically I think that what you are trying to say to me

5 is that the 2255 is still pending?

6 A.  Yes, but we know what it is, but I seriously doubt that

7 a jury would understand.  Could I explain that or if the Court

8 would?

9     MR. CLARK:  Would the Court explain it?

10     MR. SCHATTNIK:  The Court would be better.

11     MR. MABIE:  He might know a little more about it than

12 I do.

13     THE COURT:  Folks, you are going to be experts on the

14 400 series of rules as well as the criminal appellate

15 procedure.

16     When a defendant in Criminal Court pleads guilty or

17 is found guilty, it is the obligation of the Court to sentence

18 them.  Individuals who are found guilty and have this

19 conviction have two ways to appeal the conviction and the

20 sentence.  The first is what we call direct appeal.  Within 14

21 days of sentencing they can file a Notice of Appeal and then

22 their case goes to the Court of Appeals in their respective

23 Circuit.  The Missouri case, as close as Missouri is to here,

24 it is completely different.  That is the Eighth Circuit Court

25 of Appeals.  It sits in St. Louis.  Cases from here go to the

71

1    Seventh Circuit Court of appeals, which sits in Chicago.  So

2    someone who is convicted in Missouri has 14 days to file

3    Notice of Appeal.  Their case is then briefed and the Eighth

4    Circuit Court of Appeals decides whether or not they are

5    entitled to a new trial, whether there was anything improper

6    that happened at this level.  That is called direct appeal.

7    Same thing happens in the Seventh Circuit except it goes to

8    the Chicago Seventh Circuit Court of Appeals.

9            There is a second way the defendant can appeal that

10   is what we call a 2255 that was mentioned.  We call it that

11   because it is found in the Statute books at 18, United States

12   Code, Section 2255.  In that a defendant can claim they have a

13   right to be released on the grounds their sentence was imposed

14   in violation of the Constitution or laws of the United States

15   or the Court was without jurisdiction to impose it or the

16   sentence was in excess of the maximum authorized by law or

17   somehow subject to collateral attack.  So it is a separate way

18   for a defendant to appeal.

19           In Mr. Mabie's case, his direct appeal to the Eighth

20   Circuit Court of Appeals was decided and he lost.  He is now

21   pursuing a 2255, which is a way to attack his case within the

22   year.  Have I got the facts right?  I know the law is right,

23   but am I factually correct?

24           MR. MABIE:  Yes, I would say as far as what they need

25   to know.

72

1          THE COURT:  All right.  Mr. Clark?

2                    RECROSS EXAMINATION

3    Questions by Mr. Clark:

4    Q.     With respect to Mr. Reisch's conviction, you are aware

5    that the conviction was for conspiracy to distribute

6    marijuana, correct?

7    A.     Over a period of years, yes, sir, and there was money

8    laundering.

9    Q.     There was money laundering?

10   A.     He didn't plead guilty to the money laundering, but the

11   conspiracy, you know, the other persons in the conspiracy, I

12   don't know if they have been convicted or what their deal is

13   with the money laundering, but there is money laundering

14   involved.

15   Q.     So perhaps somebody else was doing money laundering,

16   but you are aware Mr. Reisch's conviction was confined to

17   conspiracy to distribute marijuana, correct?

18   A.     That is what he pled out to.

19   Q.     You are also aware he only got four months on that,

20   correct?

21          MR. SCHATTNIK:  Objection to the relevance of four

22   months or four years.

23          THE COURT:  Sustained.  That was judge's decision.

24   He could have gotten up to 20.  Was it conspiracy?

25          MR. CLARK:  He could have gotten up to 20 years,

73

1    right.  That is all of the questions I have of this witness,

2    Your Honor.

3              THE COURT:  Any follow-up?

4              MR. SCHATNIK:  No follow-up.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21              I certify that the foregoing is a correct transcript

22    from the record of proceedings in the above-entitled matter.

23

24    SS/Barbara Kniepmann                    January 19, 2015

25